# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LILLY ANNE HOPKINS, aka SAMUEL HOPKINS, TDCJ #1986831, JOHN B. CONNALLY UNIT, | § § § § | |
| Plaintiff | § § | |
| v. | § § | Civil No. 4:19-CV-05041 |
| LORIE DAVIS, TDCJ-CID DIRECTOR, LANNETTE LINTHICUM, TDCJ HEALTH SERVICES DIV. DIR., DR. JOSEPH PENN, UTMB, HEAD OF TDCJ PSYCHIATRY, DR. ROBERT BARROW, CMHCC MEMBER AND CHAIRPERSON, DR. BEN RAIMER, CMHCC MEMBER, DR. CYNTHIA JUMPER, CMHCC MEMBER, ERIN WYRICK, CHMCC MEMBER, DR. PRESTON JOHNSON, CMHCC MEMBER, DR. PARKER HUDSON III, CHMCC MEMBER, DR. JOHN BURMUSA, CMHCC MEMBER, KELLY GARCIA, CMHCC MEMBER | § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## SECOND AMENDED COMPLAINT

Plaintiff Lilly Anne Hopkins, ("Plaintiff" or "Ms. Hopkins") by and through her undersigned counsel, asserts the following claims against Defendants Phonso Rayford, Senior Warden, John B. Connally Unit, in his official capacity; Roger Boyd, Assistant Warden, John B. Connally Unit, in his official capacity; Calvin Davis, Assistant Warden, John B. Connally Unit, in his official capacity; Bobby Lumpkin, Director, Texas Department of Criminal Justice-Correctional Institutions

1

Division, in his official capacity; Dr. Lannette Linthicum, Director, Texas Department of Criminal Justice Health Services Division, in her official capacity; Dr. Joseph Penn, Director, Mental Health Services at University of Texas Medical Correctional Managed Care, in his official capacity; and Pamela Wagner, Nurse Practitioner, John B. Connally Unit, in her official capacity.

## INTRODUCTION

1.      Plaintiff Lilly Anne Hopkins is currently in the custody of the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID") and is being denied medically necessary treatment for gender dysphoria.  Plaintiff brings this action to compel Defendants (collectively, "the TDCJ") to treat her serious medical need consistent with their constitutional obligations under the Eighth Amendment to the United States Constitution.

2.      This action seeks declaratory and injunctive relief to redress the TDCJ-CID's violation of Plaintiff's constitutional rights.

## JURISDICTION AND VENUE

3.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 for violations of civil rights under the Eighth Amendment to the United States Constitution.

4.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) because the controversy arises under the Constitution and laws of the United States.

5.     Venue is appropriate in the Southern District of Texas pursuant to 28 U.S.C. § 1391(b) because at least one defendant resides in this district and all defendants reside in this State.

6.     Plaintiff has fully exhausted the administrative remedies reasonably available to her prior to bringing her 42 U.S.C. § 1983 civil rights claims in accordance with the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a).

## PARTIES

7.     Plaintiff is a 42-year-old woman who is transgender.  She is serving a thirty-five (35) year sentence in the custody of TDCJ-CID, and is currently incarcerated at the John B. Connally Unit in Kenedy, Texas.

8.     Defendant Phonso Rayford is the Senior Warden of the John B. Connally Unit and is sued in his official capacity.  As Senior Warden, Defendant Rayford is responsible for oversight of operations at the Connally Unit, implementation of TDCJ-CID policies and procedures, implementation of Correctional Managed Health Care Committee policies and procedures, staff training, and welfare of individuals housed at the Connally Unit.  On information and belief, Defendant Rayford directly participated in review and denials of Plaintiff's requests for appropriate, medically recommended treatment for gender dysphoria, including denying Plaintiff's requests for access to female grooming standards and female garb.  In all of his actions described in this Complaint,

Defendant Rayford is acting under color of state law and in the course of his employment.

9.     Defendant Roger Boyd is an Assistant Warden of the John B. Connally Unit and is sued in his official capacity.  As Assistant Warden, Defendant Boyd is responsible for oversight of operations at the Connally Unit, implementation of TDCJ-CID policies and procedures, implementation of Correctional Managed Health Care Committee policies and procedures, staff training, and welfare of individuals housed at the Connally Unit.  Defendant Boyd is directly responsible for enforcement of TDCJ-CID grooming standards and has personally ordered that Plaintiff's hair conform to male grooming standards.  In all his actions described in this Complaint, Defendant Boyd is acting under color of state law and in the course of his employment.

10.     Defendant Calvin Davis is an Assistant Warden of the John B. Connally Unit and is sued in his official capacity.  As Assistant Warden, Defendant Davis is responsible for oversight of operations at the Connally Unit, implementation of TDCJ-CID policies and procedures, implementation of Correctional Managed Health Care Committee policies and procedures, staff training, and welfare of individuals housed at the Connally Unit.  Defendant Davis is responsible for enforcement of TDCJ-CID grooming standards.  In all his actions described in this

Complaint, Defendant Davis is acting under color of state law and in the course of his employment.

11.     Defendant Bobby Lumpkin is the Director of the Texas Department of Criminal Justice-Correctional Institutions Division and is sued in his official capacity.   As Director of TDCJ-CID, Lumpkin is responsible for ensuring the provision of constitutionally adequate medical care for all people in the custody of TDCJ-CID, including those requiring treatment for gender dysphoria.  Lumpkin sets policies which are relied on by Connally Unit security to deny Plaintiff's requests for constitutionally adequate care, including access to female grooming standards and garb.  In all his actions described in this Complaint, Defendant Lumpkin is acting under color of state law and in the course of his employment.

12.     Defendant Lannette Linthicum, MD is the Director of the Texas Department of Criminal Justice Health Services Division, and is a Member of the Texas Correctional Managed Health Care Committee.  She is sued in her official capacity.  As Director of the Texas Department of Criminal Justice Health Services Division, Defendant Linthicum is responsible for ensuring that TDCJ-CID health care policies, directives, and protocols are properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines, including those that relate to care for gender dysphoria.  Further, as Director of the Texas Department of Criminal Justice Health Services Division, Defendant

Linthicum oversees the Office of Professional Standards, which is responsible for review of all second step medical grievances. As a Member of the Texas Correctional Managed Health Care Committee, Linthicum is responsible for the development of statewide policies for the delivery of correctional health care, including Correctional Managed Health Care Policy G-51.11 covering treatment for gender dysphoria. In all her actions described in this Complaint, Defendant Linthicum is acting under color of state law and in the course of her employment

13.    Defendant Joseph Penn, MD is the Director of Mental Health Services at University of Texas Medical Correctional Managed Care. He is sued in his official capacity. As Director of Mental Health Services, Defendant Penn acts as the statewide mental health supervisor for TDCJ-CID and facilitates and oversees all facets of mental health services. He oversees and provides psychological care, psychiatric evaluations, and crisis intervention. He implements the policies of the Correctional Managed Health Care Committee related to mental health care, including Policy G-51.11 covering treatment for gender dysphoria. As supervisor over TDCJ-CID Gender Specialists, Defendant Penn personally denied Plaintiff's Gender Specialists' requests for additional gender-affirming care, including on or about January 30, 2019 and February 12, 2020. In all of his actions described in this Complaint, Defendant Penn is acting under color of state law and in the course of his employment.

6

14.     Defendant Pamela Wagner is a Nurse Practitioner at the John B. Connally Unit and is sued in her official capacity.  Defendant Wagner is responsible for Plaintiff's regular medical care and has been deliberately indifferent to Plaintiff's medical need for treatment of gender dysphoria.  Defendant Wagner has refused to implement Plaintiff's Gender Specialists' recommendation for additional gender-affirming care, including refusing access to female grooming standards, female hairstyles, and makeup.  In all of her actions described in this Complaint, Defendant Wagner is acting under color of state law and in the course of her employment.

## GENERAL ALLEGATION

### A.     Background on Gender Dysphoria

15.     Transgender people have a gender identity that does not align with the gender they were assigned at birth.  Gender identity is a person's deeply felt, inherent sense of their own gender.  Everyone has a gender identity; and for many people, that gender identity aligns with the gender they were assigned at birth.

16.     Transgender individuals' gender identity differs from the gender assigned to them at birth.  A transgender woman, like Ms. Hopkins, is someone who has a female gender identity but was assigned "male" at birth.

17.     Gender dysphoria is a medical condition marked by clinically significant distress that may accompany the incongruence between one's experienced or expressed gender and one's gender assigned at birth.  It is recognized

as a serious medical condition, including by the American Medical Association, the American Psychiatric Association, the American Psychological Association, the Endocrine Society, the World Professional Association for Transgender Health, and courts across the country.

18.    Gender dysphoria, if left untreated, can result in clinically significant psychological distress and dysfunction, debilitating depression, and for some, suicide and death.  Suicide attempt rates are particularly alarming: over 40 percent of transgender individuals report having attempted suicide, as compared with between 1.6 and 4.6 percent of the general population.  High levels of stigmatization, discrimination, and victimization cause and exacerbate these dangers.

19.    Gender dysphoria is a diagnosable and treatable condition included in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"), as well as the International Classification of Diseases-10 (World Health Organization).

20.    The World Professional Association for Transgender Health (WPATH) is the leading professional organization dedicated to understanding and treatment of gender dysphoria.  It publishes and maintains the *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People*[1] ("Standards of

---

[1] Available at https://www.wpath.org/media/cms/Documents/SOC%20v7/ SOC%20V7_English2012.pdf?_t=1613669341 (visited September 20, 2021).

Care"), to reflect the most up-to-date science and professional consensus on treatment of gender dysphoria. The current edition was published in 2012. The Standards of Care are widely accepted by the medical community (including by the American Medical Association and the American Psychological Association) and the federal courts as providing the research-based and clinically accepted best practices for treating individuals with gender dysphoria.

21. The Standards of Care list key treatment options as:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity, including through dress and grooming);

- Hormone therapy to feminize or masculinize the body;

- Surgery to change primary and/or secondary sex characteristics (*e.g.*, breasts/chest, external and/or internal genitalia, facial features, body contouring);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of Gender Dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing

social and peer support; improving body image; or promoting resilience.

22.     A critical component of alleviating the symptoms of gender dysphoria is being able to socially transition to express one's gender identity, including through dress and grooming.  The American Medical Association, the American College of Physicians, and fourteen other major medical associations have said that "[s]ocial transition—*i.e.*, living one's life fully in accordance with one's gender identity—is often a critically important part of treatment."  Amicus Brief of American Medical Association, et al., *Bostock v. Clayton County*, Nos. 17-1618, 17-1623, 18-107, 2019 WL 3003459, at *16 (U.S. July 3, 2019).  Allowing transgender people to dress and groom themselves in accordance with their gender identity, among other treatments for gender dysphoria, is "highly effective in reducing or eliminating the incongruence and associated distress between a person's gender identity and assigned sex at birth."  *Id.* at *3.

23.     The National Commission on Correctional Health Care ("NCCHC") recommends that the treatment of prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the Standards of Care.[2]

---

[2] NCCHC Policy Statement, Transgender Health Care in Correctional Settings

24.     Gender dysphoria is a condition recognized by the Texas Correctional Managed Health Care Committee, in Policy G-51.11, as requiring treatment on a case-by-case basis, as clinically indicated.  Policy G-51.11 refers to the Standards of Care and the DSM-5.

### B.     Plaintiff's Gender Dysphoria and Denial of Medically Necessary Care

25.     Ms. Hopkins is a 42-year-old woman who is transgender.

26.     Ms. Hopkins has had a deep and abiding sense that she is female from when she was a young child.  She would dress in her mother's clothes, wear her mother's makeup, and shave her arms to look more like her mother.

27.     As Ms. Hopkins grew older, she could not publicly express her gender identity due to social pressure and stigma.  She attended a private Christian Academy and grew up in traditionally conservative household.  Ms. Hopkins would, however, privately dress and groom herself in accordance with her female gender identity whenever she could.

28.     In 2003, Ms. Hopkins graduated from Southwest Texas State University (now known as Texas State University) and began a career in tax at AIG VALIC.  Ms. Hopkins later returned to school at the University of Houston, where

_____

(October 18, 2009; reaffirmed with revision November 2020), http://www.ncchc.org/transgender-health-care-in-correctional-settings (visited September 20, 2021)

she received a Certificate of Accountancy in 2007.  Ms. Hopkins then went to work at PricewaterhouseCoopers (PwC).

29.     While working at PwC, and later at Service Corporation International, Ms. Hopkins dressed and groomed herself as a woman whenever she could.  In 2012, Ms. Hopkins acquired and took hormones to help alleviate her symptoms of gender dysphoria.

30.     Ms. Hopkins entered TDCJ custody in 2015.  Initially, she attempted to hide her transgender status, because she was afraid of violence, stigma, and abuse as a transgender woman living in a men's prison.  This caused her intense emotional and psychological distress.

31.     In January 2016, Ms. Hopkins began to seek Hormone Replacement Therapy from TDCJ-CID.  Her requests were denied, causing serious depression and suicidal ideation.

32.     On March 12, 2016, after a guard ordered Ms. Hopkins to remove her makeup and told her she was not a woman due to Ms. Hopkins still having testicles, Ms. Hopkins felt an overwhelming and acute sense of distress and dysphoria.  Using the blades from razors meant for facial shaving, Ms. Hopkins castrated herself.  This procedure resulted in profuse bleeding and nearly resulted in Ms. Hopkins death. Ms. Hopkins was taken to a hospital for emergency surgery and received a blood transfusion to save her life.

33.     Upon her return from the hospital, TDCJ denied Ms. Hopkins the ability to dress and groom herself in accordance with her gender identity and denied Ms. Hopkins hormones.  As a result, in June 2016, she attempted suicide by cutting into her jugular veins.   Following profuse bleeding, Ms. Hopkins was medically evacuated and flown to a hospital.

34.     Ms. Hopkins was formally diagnosed with gender dysphoria on October 10, 2016.  Consistent with this diagnosis, Ms. Hopkins' Gender Specialists, Kayli Dozier Joachim, NP, and Jesse Gordon, DO, acknowledged her as a transgender woman and use female pronouns (she/her/hers) to refer to her.

35.     Despite her medical diagnosis, Ms. Hopkins has been required at all times to comply with the grooming standards imposed on men at her prison, including wearing a male uniform, wearing short hair, and not being allowed to wear removable makeup.  *Compare* Texas Department of Criminal Justice, *Offender Orientation Handbook* § III.A.6 (February 2017) ("Male offenders shall keep their hair trimmed up the back of their neck and head.  Hair shall be neatly cut.  Hair shall be cut around the ears.  Sideburns shall not extend below the middle of the ears.  No block style, afro, or shag haircuts shall be permitted.   No fad or extreme hairstyles/haircuts are allowed.  No mohawks, tails, or designs cut into the hair are allowed."), *with id.* at § III.A.7 ("Female offenders shall not have extreme hairstyles.

No mohawks, 'tailed' haircuts or shaved/partially-shaved heads shall be allowed. Female offenders may wear braids in accordance with unit policy.").

36.    On December 12, 2016, Ms. Hopkins began to receive hormone replacement therapy.  While hormone therapy helped to alleviate some of Ms. Hopkins' symptoms of gender dysphoria, it did not fully alleviate the incongruence between her expressed gender and her deeply held sense of self.  Because Ms. Hopkins was denied the ability to dress and groom herself as a woman, she continued to experience severe and persistent stress, anxiety, and suicidal ideation from gender dysphoria.

37.    Although TDCJ has a policy allowing incarcerated people to own brassieres, Ms. Hopkins has had them confiscated and been unable to obtain one that fits properly.

38.    To supplement the inadequate gender dysphoria treatment provided by TDCJ, Ms. Hopkins has tattooed on her own makeup and made her own panties.

39.    While in TDCJ custody, Ms. Hopkins has repeatedly sought to dress and groom herself as a woman, but these requests have been consistently denied.

40.    As Ms. Hopkins continued to suffer from gender dysphoria while not being able to express her gender identity, her treating Gender Specialists opined that Ms. Hopkins would benefit significantly from being able to dress and groom herself as a woman.

41.     On October 30, 2018, Kayli Dozier Joachim, NP noted that, "[b]ased on severe distress [Ms. Hopkins] could benefit from being able to express self as female" including through hair and dress.

42.     A few months later, on or about January 30, 2019, Dr. Jesse Gordon also noted that Ms. Hopkins continued to experience "significant dysphoria related to gender expression" and "discussed with Dr[.] Joseph Penn."

43.     On July 30, 2019, Kayli Dozier Joachim, NP noted that Ms. Hopkins was "worried about having a forced hair cut on Connally Unit.  [Ms. Hopkins] was extremely distressed after last hair cut. . . .  Is worried about getting suicidal due to restriction on gender expression."

44.     At least on or about February 12, 2020, Ms. Hopkins' Gender Specialists again discussed Ms. Hopkins' care and treatment plan with Dr. Joseph Penn.

45.     During her most recent visits in 2020 and 2021, Ms. Hopkins' Gender Specialists noted that Ms. Hopkins is at "a particularly high risk for suicide" and continues to engage in self-harm, including cutting her arms and legs, due to the stress of being denied access to female grooming standards, including makeup, proper clothing, and appropriate hairstyles.

46.     Since December 2018, Ms. Hopkins has pursued grooming standard accommodations internally through the TDCJ-CID's grievance process, including

15

by elevating her Gender Specialist's treatment recommendation that Ms. Hopkins be allowed to express herself as female.  As to that specific request, Ms. Hopkins was informed that "medical has no control of the policies set forth by TDCJ regarding hair growth and panties."

47.     After learning that "medical has no control," Ms. Hopkins filed grievances with TDCJ security seeking to be allowed to express her gender by, inter alia, being allowed to grow her hair and to wear panties.

48.     All of Ms. Hopkins' grievances, to both medical and security, have been denied by the authorities in her facility and by TDCJ-CID's central offices.

49.     These denials, and the continued requirement that Ms. Hopkins must adhere to male grooming standards, have caused stress, anxiety, frequent self-harm, and suicidality, including a suicide attempt in March 2020.  And, on August 29, 2021, Ms. Hopkins' gender dysphoria caused her to seriously harm herself by attempting a penectomy.  She was taken to a hospital and underwent emergency surgery on August 30, 2021.

## COUNT I

### Denial of Medically Necessary Care in Violation of the Eighth Amendment to the United States Constitution

50.     Plaintiff re-alleges and incorporates by reference all of the preceding paragraphs of this complaint.

51.     Plaintiff is a woman who is transgender and has been diagnosed with gender dysphoria, a serious medical condition, which continues to cause Plaintiff serious mental distress and, without necessary and medically recommended treatment, has resulted in serious physical harm to Plaintiff.

52.     Defendants are responsible for providing adequate and necessary medical treatment to Plaintiff, including treatment for gender dysphoria.

53.     Defendants have failed to provide adequate and necessary treatment to Plaintiff that is consistent with prevailing medical standards of care for gender dysphoria.

54.     Defendants' acts and/or omissions with respect to Plaintiff's treatment reflect Defendants' policy, custom, practice, and/or procedure of failing to provide adequate and necessary medical treatment to people in TDCJ custody with gender dysphoria.

55.     Each Defendant has been and remains deliberately indifferent to Plaintiff's medical need to be adequately treated for gender dysphoria, including by denying her hair-length, makeup, and clothing accommodations, among other

17

necessary medical treatment, that would help alleviate Plaintiff's serious medical symptoms. This refusal is not based on a medical judgment concerning Plaintiff's needs.

56.    Each Defendant knows of Plaintiff's serious medical need for additional treatment for gender dysphoria and has failed to take reasonable measures to address Plaintiff's continued pain and suffering as a result of inadequate treatment.

57.    Because of Defendants' denying Plaintiff access to makeup, female clothing, and female grooming standards, Plaintiff has suffered severe psychological distress and physical harm.

58.    This denial of treatment constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment.

59.    At all relevant times, Defendants and other TDCJ-CID officials were acting under color of state law.

**<u>PRAYER FOR RELIEF</u>**

60.    Plaintiff respectfully requests that this Court:

(a)    Declare that Defendants are denying Plaintiff medically necessary treatment for gender dysphoria in violation of the Eighth Amendment to the United States Constitution;

(b)      Enter declaratory judgment and a permanent injunction directing Defendants to provide Plaintiff with access to makeup, female clothing, and female grooming standards, including access to feminine hairstyles;

(c)      Award Plaintiff her reasonable attorneys' fees, litigation expenses, and costs incurred in connection with this action from Defendants, pursuant to 42 U.S.C. § 1988; and

(d)      Award all other relief that this Court deems just and proper.

Dated:  September 21, 2021

By: */s/ Jayme Partridge*

Danielle J. Healey
Texas State Bar No. 09327980
Fed. ID No. 000035021
healey@fr.com
Jayme Partridge
Texas State Bar No. 17132060
Fed. ID No. 19621
partridge@fr.com
**FISH & RICHARDSON P.C.**
1221 McKinney Street, Suite 2800
Houston, Texas 77010
Telephone: 713-654-5300
Fax: 713-652-0109

Sarah E. Jack (*pro hac vice*)
jack@fr.com
MN State Bar No. 0400118
**FISH & RICHARDSON P.C.**
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: 612-335-5070
Fax: 612-288-9696

Brian Klosterboer
Texas State Bar No. 24107833
S.D. Tex. 3314357
bklosterboer@aclutx.org
Savannah Kumar
(*pro hac vice* )
Texas State Bar No. 24120098
skumar@aclutx.org
Adriana Piñon
Texas State Bar No. 24089768
S.D. Tex. 1829959
apinon@aclutx.org
Andre Segura
Texas State Bar No. 24107112

20

S.D. Tex. 3123385
asegura@aclutx.org
**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF TEXAS, INC.**
5225 Katy Fwy., Suite 350
Houston, Texas 77007
Telephone: 713-942-8146
Fax: 713-942-8966


*Counsel for Plaintiff Lilly Anne
Hopkins, aka Samuel Hopkins, TDCJ
#1986831*